[No. D018889. Fourth Dist., Div. One. Dec. 15, 1993.]

IRMA AQUINO et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
ROBERT REICHMAN et al., Real Parties in Interest.

## COUNSEL

Craig R. McClellan and Lamar B. Brown for Petitioners.

No appearance for Respondent.

Ault, Deuprey, Jones & Gorman, Daniel S. Bodie, Cosgrove & McGill, Michael Popcke, Greines, Martin, Stein & Richland, Kent L. Richland and Barbara W. Ravitz for Real Parties in Interest.

## OPINION

HUFFMAN, J.—In their petition for writ of mandate, Irma and Agelio Aquino (plaintiffs) challenge the trial court's order denying their petition for leave to amend their complaint for intentional and negligent infliction of emotional distress to add a claim for punitive damages pursuant to Code of Civil Procedure section 425.13.[1] Real parties in interest, Drs. Robert Reichman, Frank Bender and Max Savin (the doctor defendants), opposed the petition to amend the complaint, arguing the plaintiffs had failed to meet

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

their burden of proof that they would be able to prevail on a claim for punitive damages by clear and convincing evidence. Plaintiffs argue the trial court's order denying their petition denied them their right to a jury trial on the issue of entitlement to punitive damages, and contend they sufficiently presented a prima facie case for such damages to the trial court.

For purposes of analysis, we shall assume there is a right to jury trial on entitlement to punitive damages. Like the court in *Looney* v. *Superior Court* (1993) 16 Cal.App.4th 521, 538 [20 Cal.Rptr.2d 182] (review den. Sept. 2, 1993) (*Looney*), we then construe section 425.13 as requiring that "a plaintiff demonstrate the existence of sufficient evidence to establish a prima facie case for punitive damages, having in mind the higher clear and convincing standard of proof." The trial court's evaluation of that showing by the plaintiffs is the resolution of a legal issue, in which the court does not make credibility determinations, weigh the evidence, or draw inferences from the facts. (*Looney*, *supra*, at p. 539.) In this petition, we conduct a de novo review of that determination by the trial court, concluding no such prima facie case for punitive damages was shown by these plaintiffs, and it was appropriate for the trial court to reject the proposed pleading amendment. We accordingly deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' 26-year-old daughter, Irma Coram, was a passenger in a vehicle driven by her husband, David Coram, when it crashed into the back of a truck. The Coram family, including two daughters, was airlifted to Palomar Medical Center for medical treatment. Plaintiffs arrived at the hospital at approximately 12:30 a.m. on July 2, 1991, and learned that Mrs. Coram was in surgery due to her extensive internal injuries, and Mr. Coram was in surgery for a broken leg. When Mrs. Coram's initial surgery was completed, the trauma surgeon, defendant Dr. Savin, met with plaintiffs and their daughter, Kathleen Noblet, and told them the prognosis was not clear. Plaintiffs contend they told Dr. Savin that they wanted to be kept informed of Mrs. Coram's condition and wanted to be involved in any decisions which needed to be made regarding her treatment. They contend Dr. Savin acknowledged these requests and assured them that he would consult with them regarding her treatment. In his deposition, Dr. Savin states that he doesn't remember the family members requesting to be involved in decisions concerning Mrs. Coram's treatment.

Defendant Dr. Bender, a critical care and pulmonary medicine specialist, was called in to treat Mrs. Coram. While he was examining her, she went into a "code blue," requiring emergency resuscitative efforts. Drs. Savin and

Bender opened Mrs. Coram's chest to perform open heart massage. They then called in defendant Dr. Reichman to enlist his assistance in hooking up a heart-lung bypass machine, a cardiopulmonary support system (CPS), to oxygenate, warm, and circulate her blood. Dr. Bender notified plaintiffs and other family members who were present of the "code blue" and the need to connect her to the CPS system. Plaintiffs' daughter, Ms. Noblet, requested Dr. Bender to allow Mrs. Coram's mother or herself to see Mrs. Coram, and requested that the family be involved in the final decisions regarding her death, as the family did not want her to die alone, and they wanted to make arrangements for a priest to be present. (Plaintiff Mrs. Aquino states in her declaration in support of the motion to amend that she had promised her daughter that she would not let her die alone.) Plaintiffs contend that Dr. Bender acknowledged their requests. Ms. Noblet was then allowed to see Mrs. Coram being treated, although another doctor then had her removed from the area.

According to Ms. Noblet, she told Dr. Bender that she wanted to speak to the other doctor involved in Mrs. Coram's care, and Dr. Bender indicated that he would relay the information about the family's wishes and concerns to Dr. Reichman. In Dr. Bender's deposition, he states that his understanding after the "code blue" was that the family members wanted to be kept informed of her progress and to be involved in any decision to cease treatment. He did not recall any discussion about last rites being given.

After Dr. Reichman placed Mrs. Coram on the CPS device, he transferred her from the critical care unit to the operating room for further treatment. In his deposition, Dr. Reichman stated that a patient must be weaned from the CPS system before further bypass becomes detrimental rather than beneficial to the patient. At approximately 9:20 a.m., Dr. Reichman weaned Mrs. Coram from the device, and continued treatment for 34 minutes. Mrs. Coram was pronounced dead at 9:54 a.m. Dr. Reichman proceeded to Mr. Coram's hospital room and notified him that Mrs. Coram had died. He called the coroner's office to notify them of the death, and placed calls to Drs. Savin and Bender about the death. Dr. Reichman was then summoned to perform other emergency surgery for a period of about two or two and one-half hours. He asked a nurse to see if Dr. Savin or Dr. Bender could talk to the family. The nurse relayed the message to a social worker, who determined that Dr. Savin was also in surgery, and who decided not to call Dr. Bender to tell the family because he had not been involved in the treatment for some period of time.

In plaintiff Mrs. Aquino's declaration, she states that she saw Dr. Bender about 10:30 in the morning in the hallway, and he told her Mrs. Coram's

body temperature was improving. Around 10 a.m., hospital staff asked the family to meet in a conference room so that Dr. Reichman could meet with the family. They waited for three hours for Dr. Reichman to appear. Around 1 p.m., Dr. Savin appeared and notified the assembled family members, including plaintiffs, that Mrs. Coram was dead. According to Ms. Noblet's declaration, the doctor who notified them of the death first stated that Mrs. Coram had died 20 minutes before, when she was taken off of "the machine." Ms. Noblet states that Mrs. Aquino asked to be with Mrs. Coram, and the doctor said that that was not possible because the coroner was there. When Ms. Noblet inquired how the coroner could be there so soon, the doctor responded that she had actually died an hour before. She states that Dr. Reichman then said that the family could not be with Mrs. Coram's body, because the coroner had already taken it away, and she had actually died three hours before.

In Dr. Savin's deposition, he stated that he, not Dr. Reichman, was the one who met with the family and notified them of the death, and stated he did not tell the family she had died 20 minutes before. He notified them that she had died and then the CPS machine had been shut off, in that order. Dr. Reichman did not meet with the family until approximately an hour after they were told, when all three physicians and a hospital representative met with family members, who were angry and hostile.

Plaintiffs filed their complaint for intentional and negligent infliction of emotional distress against the doctor defendants, the hospital, and certain of the hospital staff. They brought this motion to amend the complaint to allege a claim for punitive damages, supported by declarations, deposition testimony, and lodged exhibits (hospital records and protocol provisions). All defendants opposed the motion, also filing declarations and lodged exhibits (deposition testimony, medical and coroner's records). The trial court denied the motion "since plaintiffs fail to establish a prima facie case that plaintiff will prevail on the claim for punitive damages." This petition ensued. We issued an order to show cause and solicited supplemental briefing on the applicable standard of review.[2]

In their petition, plaintiffs summarize the evidence for purposes of arguing they should be allowed to plead punitive damages as stating that the doctor defendants violated the plaintiffs' rights by:

---

[2]When the plaintiffs brought their motion to amend, they relied on *College Hospital, Inc.* v. *Superior Court* (1993) 18 Cal.App.4th 1378 [16 Cal.Rptr.2d 833]. The Supreme Court granted review of *College Hospital* (May 13, 1993 (S027255)) upon a petition for review which questioned whether a plaintiff has a constitutional right to jury trial on a claim for punitive damages. The Supreme Court has also granted review (May 20, 1993 (S032187)) in *Andrea N.* v. *Laurelwood Convalescent Hospital** (Cal.App.), on the issue of whether the Court of Appeal used the wrong standard to review whether there was sufficient evidence to send the punitive damages issue to the jury under section 425.13.

*Reporter's Note: Review dismissed January 13, 1994, and cause remanded to Court of Appeal, Second Appellate District, Division Four.

"(a) Removing their daughter from life support mechanisms, despite assuring petitioners that no changes in medical treatment would be made without their consent;

"(b) Not advising Petitioners of the death of their daughter and then covering up the actual time of death;

"(c) Telling the Petitioners that their daughter's condition was improving, after they had terminated her support system and pronounced her dead; and

"(d) Failing to allow Petitioners to give last rites to their daughter by having the dead body turned over to the Coroner before telling the waiting Petitioners the truth."

## DISCUSSION

### I

Section 425.13 sets up a procedure for the trial court to determine whether punitive damages may be alleged against health care providers in any action for damages arising out of alleged professional negligence. In pertinent part, section 425.13, subdivision (a) states, "The court may allow the filing of an amended pleading claiming punitive damages . . . on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code." The legislative history of this section shows that it was designed to prevent "unsubstantiated claims for punitive damages [from] being included in complaints against health care providers," by "establishing a pretrial hearing mechanism by which the court would determine whether an action for punitive damages could proceed." (*Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181, 189 [10 Cal.Rptr.2d 208, 832 P.2d 924].)

Several cases have construed such "prepleading hurdle statute[s]" (*Looney, supra*, 16 Cal.App.4th at p. 538) in light of the constitutional entitlement to jury trial for punitive damages claims. In *Looney*, the court relied on *Pacific Mut. Life Ins. Co.* v. *Haslip* (1991) 499 U.S. 1 [113 L.Ed.2d 1, 111 S.Ct. 1032] to hold that there is a right to jury trial of punitive damages claims. (*Looney, supra*, at p. 538, fn. 18.) For purposes of analysis of the

ruling denying the plaintiffs' motion, pending the Supreme Court's ruling in *College Hospital* (see fn. 2, *ante*), we assume that there is a constitutional right to jury trial for punitive damages, upon a proper threshold showing by the plaintiffs of entitlement to go to the jury on that issue. (See *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 113 [284 Cal.Rptr. 318, 813 P.2d 1348], discussing an ancient English common law system of civil sanctions known as amercements.)

In *Looney, supra,* interpreting section 425.13, the court relied on the reasoning of *Hung* v. *Wang* (1992) 8 Cal.App.4th 908 [11 Cal.Rptr.2d 113], interpreting Civil Code section 1714.10, applicable to a plaintiff seeking to charge an attorney with conspiracy with a client. The statute requiring a "reasonable probability" of ultimate success before the claim can be pleaded (Civ. Code, § 1714.10) was interpreted in *Hung* as not requiring a weighing of evidence by the trial judge, "but only a determination as to whether sufficient evidence had been presented to demonstrate a prima facie case." (*Looney, supra,* 16 Cal.App.4th at p. 538.) In order to interpret section 425.13 in a manner which would be consistent with its constitutionality, the court in *Looney* stated: "We therefore conclude that, in the words of the *Hung* court, it is only necessary that plaintiff provide 'a sufficient prima facie showing of facts to sustain a favorable decision if the evidence submitted by the [plaintiff] is credited.' [Citation.] The trial court is not required to make any factual determination or to become involved in any weighing process *beyond that necessarily involved in deciding whether a prima facie case for punitive damages exists.* Once the court concludes that such a case can be presented at trial it must permit the proposed amended pleading to be filed. If it concludes that no such case exists, then it properly rejects the proposed pleading amendment. In making this judgment, the trial court's consideration of the defendant's opposing affidavits does not permit a weighing of them against the plaintiff's supporting evidence, but only a determination that they do not, *as a matter of law*, defeat that evidence." (*Looney, supra,* 16 Cal.App.4th at p. 539, first italics added.)

In *Looney, supra,* 16 Cal.App.4th at page 539, the court went on to state that the trial court in making its ruling as a matter of law should apply the standard of clear and convincing evidence, since that is the standard plaintiffs would ultimately have to meet in proving entitlement to punitive damages. (*Ibid.,* quoting *Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242, 254-255 [91 L.Ed.2d 202, 215-216, 106 S.Ct. 2505].) Thus, a prima facie case of entitlement to punitive damages must meet the standard that

plaintiffs will be likely to prevail by showing malice, oppression, or fraud by clear and convincing evidence.[3]

"The imposition of such a prepleading burden does not impair [plaintiffs'] right to a jury trial. The decision which the judge is required to make under this statute [there, section 425.14] is substantially the same as in the case of a summary judgment motion." (*Rowe* v. *Superior Court, supra,* 15 Cal.App.4th at pp. 1723-1724.) The weight of authority holds that a trial court's determination on a motion for summary judgment is one of law based upon the papers submitted. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1515 [285 Cal.Rptr. 385].) Where a showing of clear and convincing evidence would be required at trial, that standard must be used by the court in ruling on a motion for summary judgment. (*Planned Protective Services, Inc.* v. *Gorton* (1988) 200 Cal.App.3d 1, 8-9 [245 Cal.Rptr. 790].)[4]

Similar threshold determinations of the sufficiency of a plaintiff's evidence may be made by the court upon motions for nonsuit (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656]) and in motions for directed verdict (*Walters* v. *Bank of America etc. Assn.* (1937) 9 Cal.2d 46, 49 [69 P.2d 839, 110 A.L.R. 1259]). Moreover, application of a statutory provision such as section 425.13 is a matter of law to be determined by the court. (*Estate of Madison* (1945) 26 Cal.2d 453, 456 [159 P.2d 630].)

█ In enacting section 425.13, subdivision (a), the Legislature apparently intended that the court could allow or disallow the filing of an amended pleading claiming punitive damages, depending on the evidentiary basis shown by the supporting and opposing affidavits presented, by making a legal determination as to whether ". . . the plaintiff has established that

---

[3]In *Rowe* v. *Superior Court* (1993) 15 Cal.App.4th 1711 [19 Cal.Rptr.2d 625], the court construed a similar prepleading statute applicable to religious organizations, section 425.14, and found the statute constitutional as not violative of jury trial rights or the establishment clause of the First Amendment to the United States Constitution. There, the writ was granted because the trial court had considered and apparently weighed all the supporting and opposing evidence and found the plaintiff had to make an evidentiary showing which demonstrated a winning case. (15 Cal.App.4th at p. 1735.)

[4]"[W]here the First Amendment mandates a 'clear and convincing' standard, the trial judge in disposing of a directed verdict motion should consider *whether a reasonable factfinder could conclude,* for example, that the plaintiff had shown actual malice with convincing clarity." (*Anderson* v. *Liberty Lobby, Inc., supra,* 477 U.S. at p. 252 [91 L.Ed.2d at p. 214], italics added.) "[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow *a rational finder of fact* to find actual malice by clear and convincing evidence." (*Id.* at p. 254 [91 L.Ed.2d at pp. 215-216], italics added.)

there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code." In other words, there is no constitutional right to plead punitive damages upon an insufficient evidentiary showing, and access to the right to plead such damages may be legislatively limited by giving a "gatekeeping" function to the trial courts. However, to preserve the right of jury trial in appropriate cases, the trial court in performing its gatekeeping function should not engage in weighing conflicting evidence, making credibility determinations, or drawing inferences from facts in assessing whether a plaintiff has made a sufficient showing of a prima facie case of entitlement to punitive damages. (*Looney, supra,* 16 Cal.App.4th at p. 539.) However, in order to give effect to the statutory language requiring opposing affidavits to be considered along with supporting ones, any uncontradicted evidence presented in opposition should be considered to fill in any blank areas in the plaintiff's showing, in order to give the court as complete a factual picture as possible. The court must also take care to distinguish between evidentiary facts and argument or hyperbole presented by counsel.

II

Turning to the evidence in this particular case, we first note that plaintiffs' substantive theory of entitlement to punitive damages is a cause of action for intentional infliction of emotional distress, since their alternative cause of action, negligent infliction of emotional distress, would not support an award of punitive damages under Civil Code section 3294.

" 'The elements of a prima facie case of intentional infliction of mental distress are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress. [Citations.]' [Citations.]" (*Bogard* v. *Employers Casualty Co.* (1985) 164 Cal.App.3d 602, 616 [210 Cal.Rptr. 578].)

"Outrageous conduct" in the intentional infliction of emotional distress context is conduct " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.]" (*Bogard* v. *Employers Casualty Co., supra,* 164 Cal.App.3d at p. 616.) To these requirements of intentionally tortious conduct are added here the requirements for a showing of punitive damages, that the defendant is guilty of "oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) Civil Code section 3294, subdivision (c) goes on to define those terms as including despicable conduct carried on with a conscious disregard of the rights or safety of others, among other things. The trial court determined that the plaintiffs had not met

this onerous burden in order to plead punitive damages. Since that determination was made as a matter of law, without conducting a weighing of the evidence, we review it de novo and assess the supporting and opposing affidavits anew. The exercise is similar to that conducted on review of a summary judgment. (*Saldana* v. *Globe-Weis Systems Co.*, *supra*, 233 Cal.App.3d at p. 1513.)

As in the procedure used in review of a nonsuit, we should view the evidence in the light most favorable to the plaintiffs. (*Carson* v. *Facilities Development Co.*, *supra*, 36 Cal.3d at pp. 838-839.) Focusing chiefly upon the three-hour delay before they learned of Mrs. Coram's death, the plaintiffs have categorized their theories of entitlement to punitive damages into a pair of claims concerning primarily Dr. Reichman's removal of Mrs. Coram from the CPS system without giving the family a chance to consent, even though some assurances had allegedly been made by other doctors that such consent would be obtained, and then turning the body over to the coroner without the opportunity for the plaintiffs to obtain last rites for Mrs. Coram. As against Dr. Savin, they primarily allege that he intentionally covered up the time of death when he notified them it had occurred. As against Dr. Bender, they primarily claim that he misled Mrs. Aquino by telling her of some improvement in her daughter's temperature after the time that she had already died. We address these three categories of claims separately.

### A

### *Dr. Reichman*

To be able to show a substantial probability they will prevail on a punitive damages claim by clear and convincing evidence against Dr. Reichman, plaintiffs would have to show that he had knowledge of their request to be able to give consent to treatment or the termination of treatment, that he had knowledge that they wished to provide last rites to Mrs. Coram at the time of her death, and that he consciously disregarded their rights in this matter and/or engaged in despicable conduct in acting as he did. All plaintiffs have shown is Dr. Bender recalled advising Dr. Reichman that there was an attentive family that wanted to be involved in patient care decisions. They have not made a clear and convincing showing that Reichman knew of their specific wishes or intentionally disregarded them.

As against Dr. Reichman, plaintiffs would also have to show that the CPS machine was a life support system which should not have been removed without family consent, rather than a treatment method subject to the

application of medical judgment. They have made no such showing except their allegations that they believed the CPS was a life support system. In the opposing materials, Dr. Reichman's deposition testimony states that the CPS system is a treatment function rather than a life support function, subject to the exercise of medical judgment as to when to terminate it. We characterize this evidence as "filling in" a gap in the plaintiffs' showing, rather than as presenting a true conflict in the evidence subject to a fact finder's resolution.

In further support of their motion, plaintiffs supplied Mr. Coram's declaration stating that he was informed of Mrs. Coram's death shortly after it occurred, and that although he offered to tell the family, the doctor told him that "they" would do it. Hospital protocol apparently dictated that a treating doctor, rather than a nurse or other hospital staff member, give notification of death to a family. Thus, Dr. Reichman did not withhold notification of Mrs. Coram's death from her husband, the next of kin, and there was evidence that he was called away to another emergency immediately after notifying the husband, which prevented him from telling her parents about the death. At about the same time Dr. Reichman notified Mr. Coram of the death, he notified the coroner, again sometime before the plaintiff parents were told. He also called Dr. Savin, who was in surgery, and Dr. Bender to notify them of the death. Dr. Bender testified he received that call at 11:30 a.m.

Although the plaintiffs have shown evidence of delay in notification of the death, they have not shown any evidence which would give rise to any inference of malice on Dr. Reichman's or the other doctors' part concerning that delay. Moreover, the court had before it the declaration of the medical examiner who took custody of Mrs. Coram's body after her death, stating that he made the decision that the family would not be permitted to view the body because it was in an unpresentable condition because of the injuries and treatment that she had received. He states that "since I have complete jurisdiction over the body, my decision cannot be overridden." This declaration does not help plaintiffs' case that the doctors should have acted differently than they did or that punitive damages should be assessed against them. The inquiry should be whether a reasonable fact finder could conclude based on this evidence that the plaintiff had adequately shown malice, oppression, or fraud. (*Anderson* v. *Liberty Lobby, Inc.*, *supra*, 477 U.S. at pp. 252, 254 [91 L.Ed.2d at pp. 214-215-216]; see fn. 4, *ante*.) In making this inquiry, the court does not engage in a weighing process beyond that necessarily involved in deciding whether a prima facie case for punitive damages exists. (*Looney*, *supra*, 16 Cal.App.4th at p. 539.) Even without weighing the evidence here, we conclude the plaintiffs have not shown that a prima facie case for punitive damages exists in these respects.

## B

### Dr. Savin

With respect to Dr. Savin's notification to the family of several times of death, plaintiffs present evidence that at the 1 p.m. meeting in which Dr. Savin notified them of the death, he first gave "20 minutes ago" as the time of death, then changed it to one hour, then changed it to three hours. The evidence showed that Dr. Savin was not involved in Mrs. Coram's care after the time that Dr. Reichman took over, supervising the use of the CPS machine until the time of her death. Plaintiffs presented excerpts from Dr. Savin's deposition showing that he didn't know when she was actually declared dead, and he wasn't sure when he learned of her death. He was told of the death when Dr. Reichman called him at the operating room, where his surgery lasted from 8:30 a.m. to 12:50 p.m.[5]

On the issue of the alleged conscious disregard of the family's wishes, although Dr. Savin recalls that a priest was present before Mrs. Coram died, he understood the priest was there to comfort the family and *possibly* to administer last rites. Again, Dr. Savin was not on the scene after Dr. Reichman took over or when the final crisis came.

Dr. Savin testified that a set of unfortunate circumstances led to the delay in notifying the family members of the death, and that a nurse should not have been sent out to notify the family earlier due to the extremely hostile atmosphere of the family in the waiting room. When Dr. Savin emerged from surgery and learned that no one had told the family, he proceeded directly to notify them of the death, although he had not been involved in Mrs. Coram's care since Dr. Reichman took over. On all the evidence, plaintiffs have not made a prima facie showing by clear and convincing evidence that Dr. Savin withheld knowledge that he had about the time of death, or that he acted in conscious disregard of their rights or in any way acted in a despicable manner.

## C

### Dr. Bender

With respect to the allegations against Dr. Bender, they are centered on his alleged notification to Mrs. Aquino at about 10:30 a.m., after Mrs.

---

[5]Dr. Savin also testified that he didn't know if he told the family a time of death, but if he did, it was a pure guess at that point. We must, however, consistent with the approach in *Looney, supra,* 16 Cal.App.4th 521, disregard such conflicting evidence in assessing the ruling on the motion under section 425.13.

Coram was already dead, that there had been some improvement in her condition. In order to make out a prima facie of punitive damages, plaintiffs would have to be able to show that Dr. Bender concealed knowledge that he had, and that the exact sequence of events showed fraud or conscious disregard of the plaintiffs' rights. The plaintiffs have not shown Dr. Bender was actually aware of Mrs. Coram's death at the time of any alleged conversation with any family members at around 10:30 a.m. to 11 a.m. advising them that Mrs. Coram's condition was improving. Nor does the plaintiffs' evidence show Dr. Bender learned of the death prior to approximately 11:30 a.m. The record does show Dr. Bender stopped off in the operating room around 9 a.m. to check on Mrs. Coram's condition, at which time she was alive. There was evidence that Mrs. Aquino was distraught that morning at the hospital and did not seem to understand what was going on.

We recognize the court must not weigh conflicting evidence presented by the defense and may not make credibility determinations. (*Looney, supra,* 16 Cal.App.4th at p. 539.) We believe, however, that an accurate assessment of the evidence concerning Dr. Bender demonstrates it is most unlikely the plaintiffs will be able to show Dr. Bender was aware of Mrs. Coram's death when he allegedly talked to the family about her condition. We thus conclude plaintiffs will most probably be unable to prevail on their claim for punitive damages, by clear and convincing evidence, based on allegations Dr. Bender acted with fraud, oppression or malice. (Civ. Code, § 3294, subd. (a).)

D

*Conclusion*

As a matter of law, we conclude the plaintiffs have made an insufficient showing of their prima facie case of entitlement to recovery for punitive damages, by clear and convincing evidence, against these doctor defendants. Section 425.13 contemplates that upon the supporting and opposing affidavits, the trial court may decide yea or nay as to whether the plaintiff has established a substantial probability of prevailing on the claim for punitive damages. The trial court here decided the showing was inadequate and, on de novo review, we agree. A reasonable fact finder could not conclude, based on all this evidence, that the plaintiffs had shown with convincing clarity the presence of malice, oppression or fraud. (*Anderson* v. *Liberty Lobby, Inc., supra,* 477 U.S. at pp. 252, 254 [91 L.Ed.2d at pp. 214, 215-216].) Although a prima facie case might be established under more extreme circumstances, where a case of coverup of negligent care or criminal conduct was clearly shown, this is not such a case. Instead, evaluating

the evidence results in a conclusion that these circumstances would more likely be evaluated by a fact finder as more consistent with negligence or mistakes in judgment, if any liability were found, as opposed to malice, oppression or fraud.

### DISPOSITION

The petition is denied.

Todd, Acting P. J., and Froehlich, J., concurred.

Petitioners' application for review by the Supreme Court was denied March 2, 1994.