Filed 6/24/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Estate of TARUK JOSEPH BEN-ALI, Deceased. | A132979 |
| IVAN W. GOLDE, Petitioner and Respondent, v. WENDELYN EYVONNE WILBURN et al., Contestants and Appellants. | (Alameda County Super. Ct. No. HP09432597) ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 29, 2013, be modified as follows:

1. On page 2, in the first full paragraph, delete the existing second sentence in the paragraph and replace it with the following sentence:

Hassan lived in the building on and off during that time period and, according to Jackson, continued to handle all aspects of managing the property despite title being in their son's name.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

_____

Margulies, Acting P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Estate of TARUK JOSEPH BEN-ALI, Deceased. | |
| IVAN W. GOLDE, Petitioner and Respondent, v. WENDELYN EYVONNE WILBURN et al., Contestants and Appellants. | A132979 (Alameda County Super. Ct. No. HP09432597) |

The intestate heirs of decedent Taruk Joseph Ben-Ali appeal from a judgment admitting the decedent's will to probate. Appellants contend there was insufficient evidence of due execution under Probate Code[1] section 6110. We agree, and reverse the judgment.

## I. BACKGROUND

### A. *The Parties*

Taruk, born in 1968, was the only biological child of Hassan Ben-Ali and Ann Jackson. Hassan and Jackson were married in 1973 and divorced in 1974, but maintained a relationship over the next 34 years. Hassan also had a son from a different relationship, D'Artagnan Lloyd, with whom Hassan had little contact before 2006. According to Hassan's attorney, respondent Ivan Golde, Hassan was a very shrewd and savvy real estate investor who had owned a lot of properties over the years and had also gone

---

[1] All statutory references are to the Probate Code unless otherwise indicated.

1

through financial problems, including tax problems. One of Hassan's properties was an apartment building at 2235 Ashby Avenue in Berkeley (hereafter Ashby property or Ashby building), which Hassan had transferred to Taruk in approximately 1993, perhaps to avoid losing the property to the IRS.

In 1995, Jackson moved into an apartment in the Ashby building. Hassan occupied another apartment in the building at that time and, according to Jackson, continued to handle all aspects of managing the property despite title being in their son's name. On August 3, 2002, Taruk married appellant Wendelyn Wilburn. According to Wilburn, Hassan opposed the marriage, believed Wilburn just wanted to obtain a portion of the Ashby property, and persisted in trying to talk Taruk out of marrying her down to the day of their wedding. At the time of the marriage, Taruk had a young daughter from a previous relationship, appellant Brittany Desmond, and Wilburn had a son. Wilburn was aware when she married Taruk that he had spent time in prison and had a history of drug problems. According to Wilburn, drugs were not an issue for Taruk during their relationship and marriage until sometime in early 2004, when he relapsed into using drugs.

**B. *Decedent's Disappearance and Death***

Wilburn was on a business trip in Las Vegas on June 8, 2004, when she communicated with Taruk by telephone for the last time. Over the next two days, Wilburn repeatedly tried to call Taruk from Las Vegas, but got no answer. When she returned from her trip, she called Hassan to find out if he knew where Taruk was. Hassan told her Taruk had decided to leave her and start a new life somewhere else. He told similar stories to Jackson and others who inquired about Taruk's whereabouts. Wilburn testified she did not believe Hassan, and made attempts to locate Taruk, but neither Wilburn nor anyone else reported Taruk's disappearance to the police. Between June 2004 and December 2008, Hassan continued to manage Taruk's apartment building in Taruk's name, collected rents, forged Taruk's name on checks drawn against Taruk's bank accounts, and refinanced the property in the amount of $600,000 by forging Taruk's signature and the signature of a notary.

2

In November 2008, Hassan called Golde and asked to meet with him. Hassan informed Golde that Taruk had in fact died in 2004. Hassan explained he had found Taruk dead of a drug overdose in a hotel room. Not wanting to report the death for fear of losing the Ashby property, he had taken Taruk's body to the property and hidden it in the wall of a storage area of the building. Hassan further informed Golde that a person who had assisted him in the removal and concealment of Taruk's body was extorting substantial sums of money from him by threatening to reveal what had happened.

Hassan committed suicide on December 15, 2008, while Berkeley police officers were visiting the property. Two days later, Taruk's body was discovered on the premises. Police believed Taruk had died four and half years earlier, in June 2004. Hassan left a will, not contested in this proceeding, in which he named his former spouse, Ann Jackson, as the sole beneficiary of his estate.

## C. *Decedent's Will*

Among Hassan's possessions, police found a purported will of Taruk, bearing the apparent signatures of Taruk and two attesting witnesses. The typewritten document was dated August 16, 2002, two weeks after Taruk and Wilburn were married, and the day before they were to leave town for a honeymoon in Hawaii. It recited that Taruk had one living child, Brittany Desmond. The document provided Taruk's "wife," who was the only person not referred to by name in it, was to receive all of Taruk's personal property, and his father, Hassan Ben-Ali, was to receive all other assets. It further stated Desmond "has been provided for by a life insurance policy on my life, which is held in trust for her by my father, Hassan Ben-Ali."[2] Hassan was identified as executor of the estate in the document, and "Attorney Ivan Gold" was named as the alternate executor.[3]

The purported will contained an attestation clause stating it was signed by Taruk in the presence of two witnesses who also signed in the presence of each other and that

---

[2] No such life insurance policy was ever found.

[3] Golde had represented Taruk in some criminal matters and in a workers' compensation case. According to Golde, he and Taruk were also good friends who socialized together frequently.

Taruk declared to them the document was his "Last Will and Testament." One of the witness signatures was of "Wendy Ben-Ali" with an address of "2235 Ashby #201 Berkeley, Ca." The handwritten name and address of the second purported witness were illegible, and the identity of that person has never been determined.

## D. *Probate Court Proceedings*

Wilburn filed a petition for appointment and for letters of administration. Lloyd filed a separate petition for appointment and for probate of the will. Golde filed a petition to be appointed the executor of Taruk's will, and for probate of the will. Wilburn and Desmond objected to the petitions filed by Lloyd and Golde, and filed contests to the validity of the purported will. The question of the validity of Taruk's purported will of August 16, 2002, was tried to the court. The primary issues were whether the will was duly executed according to the requirements of section 6110, subdivision (c)(1) or, if not, whether the will's proponents proved by clear and convincing evidence under subdivision (c)(2) that Taruk intended the instrument to constitute his will when he signed it.[4]

Respondent's forensic document expert, David Moore, testified he believed with a high degree of certainty Taruk's signature on the will was authentic based on comparing it with known signatures of Taruk. He further believed Wilburn's signature was "probably" genuine based on comparison with one known signature by Wilburn in which

---

[4] With certain exceptions not relevant here, section 6110 provides that in addition to being signed either by the testator or some other person at the testator's direction, the will is not valid unless it is either "witnessed by being signed, during the testator's lifetime, by at least two persons each of whom (A) being present at the same time, witnessed either the signing of the will or the testator's acknowledgment of the signature or of the will and (B) understand that the instrument they sign is the testator's will." (§ 6110, subds. (a), (b), (c)(1).) Subdivision (c)(2) of section 6110 alternatively provides that if a will was not executed in compliance with the witnessing and attestation requirements of subdivision (c)(1), it "shall be treated as if it was executed in compliance with that paragraph if the proponent of the will establishes by clear and convincing evidence that, at the time the testator signed the will, the testator intended the will to constitute the testator's will."

she signed as "Wendy Ben-Ali." Appellants' forensic document expert, James Blanco, opined it was "highly probable" the signatures of Taruk and Wilburn on the will were not genuine. Wilburn denied witnessing or signing the will, although she acknowledged the "Wendy" portion of the signature looked like "something [she] would write." She testified Hassan asked her to sign something in 2004, which he told her was a medical release needed in case Taruk required medical attention. Wilburn further testified she never lived at the Ashby building, and did not use or sign documents with the surname "Ben-Ali," except for one application she filled out with Taruk on August 2, 2002.

**E.  *Probate Court Decision***

The probate court rejected expert Blanco's analysis of Taruk's and Wilburn's signatures and accepted the testimony of expert Moore that both signatures were genuine. The court found these conclusions were bolstered by circumstantial evidence including (1) the common understanding that wills are often executed in anticipation of taking a trip, (2) the fact Taruk and Wilburn were flying to Hawaii the morning after the will was executed, (3) a reasonable inference Taruk wanted to be certain his testamentary intentions were made clear before embarking on that journey, and (4) the reasonable inference Taruk would want to make clear after his marriage that his father would receive the Ashby property rather than his intestate heirs. The court also noted Wilburn's interests were adverse to the will and her testimony accordingly had to be evaluated with caution.

With respect to the signature of the unknown witness, the court held the regular and complete attestation clause on the signature page of the will was prima facie evidence of the validity of the unknown signature. Further, the court held its findings regarding the validity of Taruk's and Wilburn's signatures, and the expert opinion and circumstantial evidence supporting those findings, by reasonable inference, lent credibility to the unknown signature. The court noted the evidence against the validity of the unknown signature derived from Wilburn's testimony that she did not sign the will, and by inference that the unknown signature and attestation must also be fictitious. The court found Wilburn's testimony unreliable for the following reasons:  (1) she had a

financial interest in having the will invalidated; (2) her testimony that she chose not to use the Ben-Ali last name during her marriage was contradicted by her use of it just two weeks before the date of the will; and (3) her testimony regarding what she may have signed, and when, was vague and equivocal, and her memory seemed selective. The court found the evidence in favor of the validity of the unknown signature outweighed the evidence against its validity. The court found it unnecessary to determine if there was clear and convincing evidence under section 6110, subdivision (c)(2) that Taruk intended the will to be his testamentary instrument, but observed such evidence "far outweighs the evidence to the contrary."

The court denied Wilburn's petition for letters, denied the will contest, granted the petitions for probate of the will, and made its own appointment of an administrator in view of an express waiver by Golde of his right to appointment.

This timely appeal followed.

## II. DISCUSSION

Appellants contend (1) the trial court erred in applying a presumption of due execution since the proponents failed to establish the genuineness of the signatures of both witnesses, and (2) the proponents failed to establish by clear and convincing evidence the decedent intended the contested document to be his will.

### A. *Standard of Review*

The question of due execution of a will is one of fact, and the probate court's finding will not be reversed on appeal if there is any substantial evidence to sustain it. (*Estate of Fletcher* (1958) 50 Cal.2d 317, 320.) In this case, however, the probate court relied on a rebuttable presumption of due execution which it found arose as a matter of law from the regular and complete attestation clause on the signature page of the will, buttressed by evidence of the genuineness of the signatures of Taruk and Wilburn. Thus, as a threshold matter, we are confronted with a question of law: In the face of contrary

6

evidence,[5] is evidence of the genuineness of the signatures of the testator and one of two subscribing witnesses on the signature page of a will containing a regular and complete attestation clause sufficient to establish due execution for purposes of section 6110, subdivision (c)(1)?  This is a purely legal issue—the interpretation of a statute—that is subject to de novo review.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

If the proponents' evidence was insufficient to establish compliance with section 6110, subdivision (c)(1), we must address whether the proponents nonetheless proved by clear and convincing evidence under section 6110, subdivision (c)(2) that Taruk intended the document in issue to be his will.  The probate court made no finding on this issue to which this court must defer.  We may therefore decide as a matter of law whether a reasonable fact finder could determine the evidence of Taruk's intent was clear and convincing.  (See, e.g., *In re Henry V.* (2004) 119 Cal.App.4th 522, 530; *City of Santa Cruz v. Pacific Gas & Electric Co.* (2000) 82 Cal.App.4th 1167, 1180; *Aquino v. Superior Court* (1993) 21 Cal.App.4th 847, 860.)

**B.  *Proof of Due Execution***

Relying on *Estate of Pitcairn* (1936) 6 Cal.2d. 730 (*Pitcairn*), the trial court held the regular and complete attestation clause on the signature page of the will was prima facie evidence of the validity of the unknown witness signature.  For the reasons discussed below, we believe the trial court misread *Pitcairn*.  It did not hold a regular and complete attestation clause could establish the genuineness of an unknown signature, but the converse—proof of the genuineness of the subscribing witnesses' signatures is sufficient to create a presumption of due execution notwithstanding an irregular or incomplete attestation clause.

Preliminarily, we note the power to make a will is conferred solely by statute: "The power to dispose of one's property by will and the mode by which it may be

---

[5] While respondent asserts "no evidence" was offered to rebut due execution, the testimony of Wilburn and documents expert Blanco, if credited, does rebut any presumption of due execution.

exercised are matters under legislative control, and the mode prescribed by the statute must be followed, or there is no will." (*Estate of Manchester* (1917) 174 Cal. 417, 419–420.) When due execution of a will is contested, the proponents of the will have the burden of proving it. (§ 8252, subd. (a).) Section 8253 specifies how execution may be proven: "At the trial, each subscribing witness shall be produced and examined. If no subscribing witness is available as a witness within the meaning of Section 240 of the Evidence Code, the court may admit the evidence of other witnesses to prove the due execution of the will."

*Pitcairn* was an appeal from a judgment admitting a contested will to probate. (*Pitcairn, supra,* 6 Cal.2d at p. 731.) The only ground of contest was that the will was not executed with the formalities required by statute. (*Ibid.*) There was no dispute the will was signed by the testatrix or that it was subscribed by two witnesses, both of whom testified at the trial. (*Ibid.*) However, one of the subscribing witnesses testified she was not present in the room when the testatrix signed and that she was asked to sign a piece of paper without being told it was a will. (*Ibid.*) There was some evidence of an adverse attitude and untrustworthy recollection on the part of the witness. (*Id.* at pp. 731–732.) Further, the attestation clause was incomplete and merely recited it was " 'Signed & witnessed' " by the witnesses. (*Id.* at p. 731.) The trial court found in favor of the proponents, and the issue before the reviewing court was whether there was substantial evidence to support its findings and judgment. (*Ibid.*) The court described the issue more particularly as follows: "We have, then, a case *where the signatures of the testatrix and subscribing witnesses are genuine*; the will is attested, but lacks a formal attestation clause reciting the steps in execution; the attesting witnesses, seemingly adverse but uncontradicted on the essential issues, testify to a technical failure to comply with the formalities of execution. In such a case, may the trial court admit the will to probate?" (*Id.* at p. 732, italics added.)

The Supreme Court concluded the trial court could admit the will to probate on those facts. First, the court noted the rule that a regular and complete attestation clause makes out a prima facie case of due execution. (*Pitcairn, supra,* 6 Cal.2d at p. 732.)

8

This rule came about because if the witnesses are dead, unavailable, or unable to testify or recollect, or are adverse or corrupt, it is necessary to rely on other evidence of the sufficiency of the instrument. (*Ibid.*) However, the court rejected the suggestion that it is the specific recitals in the clause that furnish the basis for the presumption. (*Ibid.*) Instead, it found "[t]he foundation of the presumption is the proof of genuineness of the signatures, for the instrument is then on its face a valid will." (*Ibid.*) The recitals in an attestation clause may add to the weight or force of the presumption, but they do not in themselves create the logical basis for it. (*Id.* at pp. 732–733.) The *Pitcairn* court cited two earlier California cases also standing for the proposition that the presumption of due execution, when it exists, depends upon proof of the genuineness of the subscribing witnesses' signatures. (See *Estate of Kent* (1911) 161 Cal. 142, 143–145 (*Kent*) [testimony of a single subscribing witness authenticating signatures of both witnesses validates will lacking any attesting clause]; *Estate of Tyler* (1898) 121 Cal. 405, 406–409 (*Tyler*) [will upheld notwithstanding an incomplete attestation clause where the evidence established the genuineness of the testatrix's and both subscribing witnesses' signatures].)[6]

Respondent cites *Estate of Gerst* (1957) 153 Cal.App.2d 528. The relevant facts in *Gerst* were stated as follows: "The signatures of both witnesses are genuine. One witness . . . predeceased testatrix; and the other . . . had absolutely no recollection of the circumstances surrounding the execution of the will or the affixing of his own signature thereto." (*Id.* at p. 534.) In *Gerst*, the court merely applied the rule stated in *Pitcairn*, *Kent*, and *Tyler* that " '*where a will bears the genuine signatures of the testator and*

---

[6] There is some authority that the presumption discussed in *Pitcairn* and the earlier cases is no longer considered evidence sufficient to sustain a finding of due execution in the face of contrary evidence, but is merely a rebuttable presumption affecting the burden of producing evidence which disappears when the contrary evidence is produced. (See Evid. Code, § 600, subd. (a) [presumptions are not evidence]; 64 Cal.Jur.3d (2006) Wills, § 262 [due execution presumption is apparently one affecting the burden of producing evidence that disappears when contrary evidence is introduced].) However, whether analyzed as a presumption or as a proof requirement, the underlying question is the same: Does the record in this case establish substantial evidence of due execution?

9

*attesting witnesses*, the presumption exists on the death of the witnesses or failure of their memory that all of the requirements of Probate Code, Section 50 [section 6110's predecessor statute], proof of which depends on the recollection of the witnesses, were duly observed.' " (*Gerst*, at p. 535, citing *Tyler* and other cases, italics added.)

Estate of Burdette (2000) 81 Cal.App.4th 938, also cited by respondent, is inapposite. It merely held the will's proponents need not produce live testimony from both subscribing witnesses in order to support a presumption of due execution as long as there is other evidence the decedent's signature and the signatures of the subscribing witnesses are genuine. (*Id.* at p. 946.) It was critical to the result in *Burdette* that one of the subscribing witnesses testified he observed the decedent sign the contested will and he identified his signature *and that of the other subscribing witness* on the will. (*Id.* at pp. 941–942.) Under those circumstances, no testimony from the other witness was held to be necessary. (*Id.* at p. 946; see also *Estate of Cecala* (1949) 92 Cal.App.2d 834, 838 [proponents entitled to presumption of due execution where signatures of at least two subscribing witnesses were shown to be genuine].)

We have found no California case in which evidence of the genuineness of the decedent's signature and of the signature of *only one* subscribing witness was held to be sufficient to establish the genuineness of *another* witness's signature, or to create a presumption or prima facie evidence of due execution.[7] Such evidence was found insufficient for that purpose in *Estate of Wood* (1934) 274 N.Y.S. 461.[8] (See also *Estate*

---

[7] We found one Texas statute, Texas Probate Code section 84, subdivision (b)(3), which allows proof by evidence of the genuineness of the signature of only one subscribing witness if none of the witnesses is living, or all are members of the armed forces and beyond the jurisdiction of the court. (But see *Howard Hughes Medical Institute v. Neff* (Tex.Ct.App. 1982) 640 S.W.2d 942, 949–950 [where no one could testify as to the identity of either of the attesting witnesses, the evidence was insufficient to prove due execution].) California has no statutory provision comparable to the Texas provision.

[8] "The question presented here is whether there is proof, under the statutes and decisions, sufficient to establish the will. . . . [¶] In support of probate, certain testimony has been taken in this proceeding. The signature of the testatrix has been established as

10

*of Cann* (1928) 240 N.Y.S. 840 [proof of signatures of both subscribing witnesses required]; *Estate of Speers* (Okla. 2008) 179 P.3d 1265, 1272–1273 [will denied probate where there was no competent evidence establishing unavailability of second witness or genuineness of her signature].)

In short, the rule in California and elsewhere is that proof of the signatures of the decedent and the witnesses makes out a prima facie case of due execution.  (*Pitcairn, supra*, 6 Cal.2d at p. 732.)  Proof of the signature of the decedent and of only one of the witnesses does not.  Respondent complains that under this rule if both witnesses are deceased, or the sole available witness has a financial motive to defeat the will, it can never be admitted to probate over objection.  Not so.  The Evidence Code specifically provides the testimony of a subscribing witness is not required to authenticate a writing. (Evid. Code, §§ 1411, 1412.)  Witness signatures can be authenticated by a variety of means including eyewitness testimony (Evid. Code, § 1413), lay opinion testimony by a person familiar with the writer's handwriting (*id.*, § 1416), comparison by the trier of fact (*id.*, § 1417), and expert testimony (*id.*, § 1418).  No such evidence was produced in this case regarding the signature of the unidentified purported witness.  There was therefore no adequate evidentiary basis for determining the illegible entry on the signature page of the will was in fact a signature and, if so, that it was made by a person distinct from the testator who was competent, present during the execution, and understood the instrument to be a will.

The probate court erred in admitting the will to probate on the basis of section 6110, subdivision (c)(1).

---

authentic.  The handwriting of one of the subscribing witnesses, Benjamin Wood, has likewise been proven. The record is barren, however, of any proof of the handwriting of the other unidentified subscribing witness, 'R. F. McCormack.' [¶] Under these circumstances, I am compelled to hold that the will is not entitled to be admitted to probate." (*Estate of Wood, supra*, 274 N.Y.S. at p. 462.)

## C. *Evidence of Testator's Intent*

A will not executed in compliance with section 6110, subdivision (c)(1) may nonetheless be admitted to probate if the proponent establishes by clear and convincing evidence the testator intended the instrument to constitute his will at the time he signed it. (§ 6110, subd. (c)(2).) The clear and convincing standard " 'requires a finding of high probability. . . . " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1211–1212.) In our view, no reasonable trier of fact could find that standard has been reached on the record before us.

Taruk was only 34 years old when he allegedly executed his will. No witness in this case knew anything about the will or the circumstances of its execution.[9] There was no evidence Taruk had spoken about his testamentary intentions with anyone, or that Wilburn ever mentioned the will to anyone between 2002 and its discovery in 2008—despite the fact that her husband's decision not to provide for her in his will would presumably have been a topic of some interest to her. There was also no testimony as to how the typewritten will had been prepared, who had drafted it, or who Taruk might have consulted about its terms or phrasing. Significantly, no original or copy of the will was found at Taruk's residence or among his belongings. The will was found among the belongings of Taruk's father, Hassan. The evidence showed Hassan was a man willing to go to extremes of fraud and dishonesty in order to protect his financial interests and, in particular, to retain control of the Ashby property—which was both his residence and a major source of his income. Before taking his own life, Hassan had hidden his son's body behind a wall, perpetrated a callous fraud on Taruk's mother, spouse, and friends about Taruk's fate, and had impersonated Taruk and forged his name to multiple

---

[9] At one point, Golde offered vague, equivocal testimony to the effect that Taruk indicated or implied at one point he had a will or "some sort of instrument." Taruk's mother testified he had never spoken to her about a will or estate planning. Wilburn, Taruk's wife and one of the purported witnesses, testified he had never spoken to her about estate planning or writing a will.

documents, all apparently for financial reasons connected to the property. At the same time, no convincing theory was offered to explain how Hassan's decision to conceal the death for financial reasons was consistent with the existence of a valid will passing Taruk's property to him. There was vague testimony about possible tax concerns, but no competent evidence of Hassan's tax situation in 2004 was admitted. On the other hand, Hassan would have had an obvious financial motive for concealing Taruk's death if a will leaving the building to Hassan did not in fact exist when Taruk died. The will document itself was far from self-authenticating. In the will, Taruk referred to Wilburn as "my wife" rather than mentioning her by name, even though they had just been married two weeks earlier. Whoever signed Wilburn's name used the Ashby property as her address even though Wilburn had never lived there. Both the signature and address of the second witness were completely indecipherable. The life insurance policy for Brittany Desmond referenced in the will has never been found, and no evidence was produced of any premiums paid for such a policy. Taruk's signature on the will—the only real evidence of Taruk's intent to make a will—was primarily authenticated by the proponents' document examiner who was not told about or shown any of the known documents on which Hassan had forged Taruk's signature.

By highlighting circumstances casting doubt on the will's provenance, we do not discount the other circumstances and evidence that persuaded the trial court Taruk did in fact sign the document in issue, and intend it as his will. But in light of the many unusual events surrounding the document, and the paucity of evidence Taruk had discussed his testamentary intent with others, we do not believe a reasonable fact finder could conclude those facts were proven by clear and convincing evidence.

Accordingly, we reverse the judgment and remand for further proceedings consistent with the views expressed herein. We make no judgment about the reappointment of a special administrator, but leave that to the probate court's discretion.

## III. DISPOSITION

The judgment is reversed and the matter is remanded to the probate court for the entry of a new judgment upholding appellants' contest of the will based on insufficient evidence of due execution, denying admission of the will to probate, and providing for the administration of the estate in a manner consistent with those determinations.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Marshall Ivan Whitley

Counsel:

Goins & Associates, Vernon C. Goins and Yasmin Gilani for Contestant and Appellant Wendelyn Eyvonne Wilburn.

Law Offices of Edward J. Simone and Edward J. Simon for Contestant and Appellant Brittany Desmond.

Feldman Law Group and Aaron R. Feldman for Petitioner and Respondent.