Filed 12/29/14  Doherty v. Doherty CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Calaveras)

----

| | |
|---|---|
| ROXANNE DOHERTY, | C073408 |
| Cross-complainant and Appellant, | (Super. Ct. No. 10PR7214) |
| v. | |
| MICHAEL DOHERTY, as Cotrustee, etc., | |
| Cross-defendant and Respondent. | |
| Estate of WILLIAM F. DOHERTY, Deceased. | |
| | C073423 |
| MICHAEL DOHERTY, | (Super. Ct. No. 10PR7172) |
| Petitioner and Respondent, | |
| v. | |
| ROXANNE DOHERTY, | |
| Contestant and Appellant. | |

1

On the death of William Faulkner Doherty in July 2010, Michael Doherty and Debra Doherty McMannis (his son and daughter) filed a petition to admit his will to probate and to appoint them as executors. They also filed a petition as cotrustees to confirm the assets of the June 2010 William Doherty Trust (the trust). William's[1] widow, Roxanne (née McCoy) Doherty Jennings,[2] filed an objection to the validity of the will and a counter-petition contesting the validity of the trust. After a trial lasting 25 days with hundreds of exhibits and 31 witnesses—resulting in a transcript and appendices that fill a three-foot shelf—the trial court issued a statement of decision that confirmed the validity of both instruments. In February 2013, the trial court entered judgments in favor of Michael and Debra in the two actions.[3] Roxanne filed timely notices of appeal. On Roxanne's motion, we issued an order consolidating the two cases for the purposes of argument and decision only.

It should not be surprising that at issue is an estate valued at 30 to 50 million dollars in community assets, derived from the profits of William's electronics company— EMCO High Voltage Corporation (EMCO)—of which Michael has been the sole operations manager since 1994 and the sole executive officer after September 2009.

To reorder her arguments on appeal, Roxanne first contends the will is invalid because its execution failed to comply with Probate Code section 6110.[4] She next claims the trial court erred in applying the attorney-client privilege to a phone call between

---

[1] In keeping with the style of the briefing, we will use the Christian names of the parties.

[2] In May 2011, Roxanne married her property manager, Christopher Jennings, and was addressed by this surname at trial. As she adopted this surname only informally and did not seek to amend the captions in these actions in the trial court, we will not amend them on appeal.

[3] Debra has declined to make an appearance on appeal.

[4] Undesignated statutory references are to the Probate Code.

William and one of his lawyers three days after the execution of the instruments. Coming to her central issue, she argues that the trial court erred in failing to apply a presumption of undue influence that arose *as a matter of law*, because Michael's receipt of the entirety of William's ownership interest in EMCO (and thus *entitlement* to a full half of EMCO's profits) is an undue benefit (because it is contrary to the evidence of William's desire for the income to be equally shared among her stepchildren) that accrued to a fiduciary who was involved in the procurement of both instruments. Finally, she contends on the same basis that the bequest to Michael of William's entire EMCO ownership interest is a basis to void the instruments because they consequently do not reflect *the uncontradicted evidence* of the *testamentary intent* to have her stepchildren share EMCO income equally. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Roxanne expressly abjures any challenge to the sufficiency of the evidence, but her account of the evidence nevertheless suffers from a failure to apply the basic principles governing our appellate review of the facts.[5] This opinion's factual summary resolves all conflicts in evidence or inferences in favor of the judgment.[6] (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.)

---

[5] We note for the benefit of counsel that it is not helpful to this court to provide lengthy string cites to the record (some of which are nearly one page long in Roxanne's brief), after stating a general summation of a point of fact, without any identification of which witnesses are involved or which part of the evidentiary puzzle they are providing.

[6] We deny Roxanne's motion for judicial notice of her pleadings in a separate action against Michael (apparently focused on control of EMCO); she does not establish (either in her motion or briefing) that these materials played any part in the proceedings below (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2), nor is their relevance to this appeal apparent (*People v. Eubanks* (2011) 53 Cal.4th 110, 129, fn. 9).

*Backdrop: The Parties, Their Relations, and the Management of EMCO*

William was born in Stockton in 1937. With his first wife, Elizabeth, he had three surviving children: Debra was born in 1965, Michael was born in 1967, and Douglas was born in 1970.

William had a degree in electrical engineering. In the early 1970's, he was the president of Sierra Systems. He met Roxanne McCoy (born in 1952), who was an assembler of electronic components, when she began to report directly to him after a promotion to supervisor. EMCO initially began as a company in name only, buying components to resell them to the financially floundering Sierra Systems, which lacked vendor credit. After Sierra Systems went out of business, EMCO became a going concern in early 1975. Roxanne was then involved with procuring orders, assembling product, and shipping product.

Roxanne and William became romantically involved in the fall of 1974. They began living together in 1976. The following year, they moved to a house when his children came to live with them. They were married in 1978. The business moved to Amador County in the mid-1980's.

After leaving home at 18, Debra eventually settled in the Sacramento area as a school administrator, visiting William monthly until his health began to fail and her visits became more frequent. Douglas moved to Alaska in 1990, and was somewhat estranged from his father. Michael began working for EMCO in the fourth grade, assembling circuit boards and being paid in piecework in lieu of an allowance. By the time he was a high school senior, he was supervising a production line and assisted William with design work. Once he got his degree in electrical engineering in 1989, he began working at EMCO full time. Neither of his siblings worked for EMCO after reaching adulthood.

In the early 1990's, EMCO was in financial straits. It had laid off a quarter of its 28 employees because it could not meet its payroll. William had been overseeing EMCO

from home, but now returned to working on-site in mid-1993. At this point, Roxanne stopped working at EMCO and was never thereafter an EMCO employee in any capacity. EMCO returned to profitability and paid off its line of credit. In early 1994, William named Michael (at age 27) as the chief operating officer and limited his own responsibility to overseeing the payables, payroll, and payroll taxes from home.

Under Michael's stewardship, EMCO's workforce increased in size from 30 to 35 employees in 1994 to a peak of 75 employees in 2006. EMCO incorporated in 1998, with William as the *sole* director and officer; Roxanne's only official position was as a stockholder with a 50 percent ownership interest in 501 shares of EMCO. Corporate revenues in its first year were about $2 million, twice the amount in 1994; by 2006, they reached almost $9 million. In a December 2002 communication regarding EMCO's financial circumstances, William stated that Michael ran the company while William collected his $200,000 in income as board chair. In March 2009, when one of his grandchildren asked if she could work at EMCO for the summer to enhance her college applications, William directed her to contact Michael because "he runs EMCO." William told people that he was proud of the successful way Michael was running EMCO (an opinion Debra urged him to share with Michael); this was a point even Roxanne conceded.

In September 2009, William told Michael that he wanted him to take over the financial duties. He told Michael and Debra that he had tried to have Roxanne perform the tasks, but she refused to do them in William's preferred manner (which Michael adopted).

There was tension between the spouses dating back to the early years of their marriage. William did not want any more children, and Roxanne resented spending a good portion of her life raising his children without any of her own. After her third abortion, this issue and others resulted in a distance between them by 1985 that made

5

them less trusting of each other. The subject of divorce first arose before 1985, and came up again in the early 1990's. These tensions came to a head by 2009. William told his children that he and Roxanne were considering divorce (though neither wanted to go through the process), with each of them demanding that the other move out, and Debra had observed outbursts of displeasure between the two. William also sent Debra e-mails complaining about Roxanne mistreating him or ignoring his needs to the point of elder abuse; Debra replied to one, "We all know that she is very difficult—okay a bitch." Debra was concerned that Roxanne was not taking good care of William, and knew of his frustrations about the absence of any physical intimacy with Roxanne. William also suspected Roxanne was having an affair with Christopher Jennings.

On the evening of June 16, 2010, the siblings were dining together at Michael's home. First Michael and then Debra received phone calls from Roxanne. They knew from past experience that she would likely be inebriated by this time of the day; her speech was slurred and she sounded agitated. She told the siblings that she wanted their father out of the house and had put his belongings outside. The siblings immediately drove over to their father's house. Roxanne was outside, looking agitated. By the front door were a suitcase and a blanket, and William's walker and wheelchair. Debra and Michael went inside to talk with their father, who told them that Roxanne had tried to drag him out of bed, although he had been able to hang on to the bed frame. Roxanne had told him she was going to leave him in the road. She then called an ambulance to remove him from the house (although he refused to leave when it arrived).

When deputies eventually arrived, they arrested Roxanne (who declared as they led her to the patrol car that no one could prove anything because there had not been any witnesses). On their own initiative, the deputies contacted a judge in the middle of the night to obtain an emergency restraining order. This was over William's objection at the

time.[7] However, *at William's request* the next day, his attorney prepared an application for an extension of the restraining order. William expressed his fear of Roxanne coming back, telling his attorney that she had "really f***'d [him] over"; Debra and Michael provided supporting affidavits, William reminding them of the facts that they needed to include.[8] The attorney filed the application on June 21. The court issued the temporary restraining order on June 22.

Roxanne filed a petition for legal separation on June 30, 2010. William died on July 2 of heart and lung failure as a complication of alcohol-induced liver and heart damage.

### William's Physical and Mental Condition in 2009-2010

Those who knew William described him as otherwise intelligent, strong-willed, single-minded, and a person who liked being in control of things. He enjoyed being the center of attention in social interactions. He liked to do things for himself, even to the point of developing his own financial software (which he used despite it being more clumsy than commercially available software).

It never even crossed the mind of William's primary care physician (who treated him from August 2009 to his death) that William had any degree of dementia, because he was articulate in the examination room, on the phone, and at social gatherings. In an April 2010 mental assessment, the doctor had charted "memory impairment" based on William missing the answers to a couple of questions (a common circumstance among the doctor's patients). He included this primarily for Medicare reimbursement purposes

---

[7] We (like the trial court before us) therefore disregard Roxanne's appellate intimations that her arrest was a function of the orchestrations of Michael and his siblings rather than her own drunken misconduct.

[8] Consequently, Roxanne's appellate intimations that the restraining order was obtained without the participation of William are not well taken.

for the time he had spent in evaluating William.  He in fact thought William had only minor memory problems that were attributable to his heavy drinking, which under the doctor's counseling he was able eventually to quit by May 2010.  His last physical exam of William was in late May 2010.  There was nothing abnormal about his psychological functioning at that time, nor during four phone consultations from May to June 2010 (and if he had perceived any apparent confusion, he would have charted it).  William had an abnormally high level of ammonia in his blood, but he did not have any other signs that would have caused the doctor to diagnose him with hepatic encephalopathy (HE), which is a loss of brain function attributable to blood poisoning from liver failure.  The doctor did want to prescribe dietary management to help forestall this possibility.

The doctor's conclusions were consistent with the observations of several emergency room physicians who treated William on five occasions from May to June 2010.  These described him generally as alert and oriented to person, place, and time, even though by June 22 he was lethargic and weakened.  If he had shown any sign of HE, a report would have made note of it; on June 19, a physician had noted the elevated ammonia levels, and cautioned William that though he was not presently showing signs of confusion this could *lead to* HE.

William's attorney had been performing legal services for him since 2004[9] and had become a close friend,[10] who communicated with him at least once a week.  As late

---

[9]  These included representing him in a challenge to a special assessment that his fire protection district had imposed.  (See, e.g., *Concerned Citizens for Responsible Government v. West Point Fire Protection Dist.* (2011) 196 Cal.App.4th 1427, review dismissed as moot (Nov. 28, 2012, S195152) & request for republication den. (Dec. 19, 2012, S195152).)

[10] Roxanne's appellate suggestion that Michael somehow introduced William to the attorney for the purposes of estate planning or induced the attorney to introduce the subject are thus not well taken.

as 2010, William was still providing valuable insights regarding litigation strategies. On June 24, 2010, the attorney had his last conversation with William, who was talking slowly but did not have any trouble with comprehension. He last visited William three days later; William was too physically weakened to do anything other than open his eyes, sit up, and then lay back down in bed again after examining an acquisition the attorney had brought to show him.

Previously, in support of the restraining order, Debra had attested to her father's continuing mental sharpness (even though his physical condition had deteriorated since the night of Roxanne's abuse), and to his adamancy about not seeing Roxanne again. In a December 2010 e-mail exchange with Christopher Jennings, Debra hotly denied that her father had experienced any diminution in his mental state in 2010, other than being conscious of the fact that he was dying.

Against these arrayed professional and lay personal observations of William, Roxanne produced a forensic psychiatrist on the issue of William's "susceptibility" to undue influence. Premised strictly on William's medical records (while acknowledging that the issue often can take a "multi-dimensional" review of evidence beyond medical records), he believed that William was suffering from HE in June 2010 that the expert "would expect" to impair his ability to perform complex thinking, and therefore made him "susceptible" to undue influence. He conceded the evidence otherwise did not show William lacked testamentary capacity within the meaning of the Probate Code or had any confusion regarding the nature of his relationships with his family. Michael's expert undertook a multi-dimensional review, and based on numerous factors beyond the medical records (which he did not believe of themselves were sufficient to establish HE) concluded that William was not susceptible to undue influence in June 2010.

9

***The Execution of the Instruments***

Whenever William raised the issue of estate planning, Roxanne became angry. She refused to cooperate in establishing a trust.

As early as 2000, William had expressed his preferences in a holographic will. He wrote (with emphasis) that all *property* he could convey was to be divided equally among his children, and requested that Roxanne convey her property to them as well. William's own stepmother had deprived him of his inheritance from his father, and he wanted to make sure that this could not happen.

William did not pursue the issue of estate planning with his attorney until the summer of 2009, when he began having heart problems and *he* asked his attorney to start preparing a trust. (William's attorney devoted only a small percentage of his practice to estate planning. He had never prepared a trust for only one spouse in a marriage.) As of the spring of 2010, they had discussed the matter at least a couple of dozen times on a daily basis.

William told his attorney that his primary concerns were conveying his share of the marital property equally to his children, and to make sure that Michael had control of EMCO. His latter goal was to protect EMCO from anyone seeking to force a sale of the company in order to obtain a share of the assets, and to prevent Roxanne from trying to take over EMCO; he wanted EMCO to continue as a company. Having researched the issue of generational transfers in family businesses, William did not think EMCO could be successfully run with a committee of family members who did not have experience with managing it, and he was particularly concerned that Douglas would align with Roxanne to allow her to wrest control from Michael and jeopardize his job. He directed his attorney (with Michael's assistance) to convert any assets held in joint tenancy to

10

tenancy in common, in order that he could convey his share to his children.[11]  He

believed Roxanne's community interests were more than an adequate share of the wealth

arising during their marriage.

William had told Michael of his plans for conveying control of EMCO to him.

Debra and Douglas acknowledged that this was William's intent, and agreed that Michael

properly should be in control of EMCO.

William initially sought Roxanne's consent in jointly giving Michael an option to

buy additionally issued shares of EMCO stock.  After initially signaling her approval, she

ultimately refused on the ground that the option was effective immediately rather than

after William's death.  William then unilaterally executed a stock option as a director of

EMCO on June 6, 2010, for 50 shares.[12]

William's attorney presented him on June 8 with a will that the attorney had

drafted.  This provided for Michael inheriting William's interest in EMCO, with the

siblings sharing equally in the rest of William's property.  The attorney had discussed

these provisions extensively with William, and reviewed them again with William when

he presented the document for execution.  Although William was interested in making

provision for equal profit sharing among the siblings, he decided not to include it at that

time because of the complications entailed in providing a *right* to profit sharing divorced

from any ownership interest, and he was more focused on keeping EMCO intact until

---

[11] In light of this evidence, Roxanne's appellate suggestions that there was something untoward about Michael's actions in this regard are not well taken.

[12] Roxanne, unsurprisingly, contests the validity of this option on appeal and repeatedly objects to any reference to Michael being conveyed a "controlling" interest.  However, the issue is not of any moment in the present appeal.

finding a solution to those complications.[13] William signed the will in the presence of two disinterested witnesses. At the same time, William executed a number of documents to convert joint tenancies to tenancies in common.

On June 18 (after Roxanne's arrest), the attorney had William execute an identical version of the June 8 will in front of two other disinterested witnesses. He did this out of an abundance of caution, because one of the witnesses to the June 8 will had expressed uncertainty about whether William was aware that he was signing a will.

William still wanted a trust to avoid probate. Given his attorney's limited skills in drafting trusts, *William told him* on June 17 and 18 to meet with attorneys from the Boutin law firm in Sacramento (now denominated "Boutin Jones, Inc."), with whom both William and Michael had prior dealings in legal matters for EMCO since the 1990's. (Michael had told his siblings the previous evening that this was a goal of his as well, a lawyer at the Boutin firm having recommended its estate planning services earlier in the year and Michael lacking confidence in the abilities of William's attorney.) Since William was eager to get this done, after the execution of the will his attorney went that same day on William's behalf to the Boutin firm to discuss the drafting of a trust and will, and taking corporate action to facilitate William's transfer of a controlling interest in EMCO after his death to Michael. Michael went with William's attorney to the meeting.[14] William's attorney signed an agreement for the Boutin firm to "assist [him] in

_____

[13] The parties do not discuss the legal basis of these "complications" (other than brief adumbrative commentary in Roxanne's reply brief), so we will not expand upon this subject further.

[14] We disregard Roxanne's appellate efforts to draw *contrary* inferences from this evidence that the orchestration of this meeting is actually attributable solely to Michael, as this is yet again contrary to the principles of appellate review. In particular, we note the contents of an e-mail that Michael sent to Boutin on the morning of June 18 *after* speaking with his father, who "agree[d] 100%. He wants to move forward now, he says

12

connection with [his] representation of William F. Doherty" regarding "personal estate matters" and "corporate matters relating to his equity ownership" of EMCO. The two Boutin lawyers expressly told Michael that neither they nor William's attorney would be representing his interests in this matter. There was discussion with the corporate Boutin lawyer about the aforementioned "difficulties" in developing an agreement to share profits among the three siblings without transferring any ownership interest to Debra or Douglas.

The estate planning Boutin lawyer immediately prepared a limited power of attorney for William to execute, in the event the siblings needed to contact any financial institution on Saturday to prevent Roxanne from seizing bank accounts. Relying on the June 18 will as the expression of William's dispositional intentions, the Boutin lawyer prepared a new pour-over will, a trust, and other testamentary documents over the course of the weekend after the arrest of Roxanne. The Boutin attorney sent William's attorney a draft of the documents on Monday (June 21), including a "general transfer" reflecting the trustor's general intent to put all assets into the trust. The will transferred all of William's assets to the trust, and the trust once again provided for a transfer of William's EMCO interest to Michael, with the remainder of the assets divided equally among the siblings. The only change the Boutin lawyer effected was to name Michael and Debra jointly as trustees and executors, an alteration *intended* to share the burden of anticipated litigation by Roxanne.

William's attorney brought him the documents on the afternoon of June 21. William was sitting in a chair in the living room, awake and alert. He did not appear to have any difficulty comprehending his attorney. The attorney explained the provisions of the various documents (the will, trust, general transfer, and limited power of attorney)

---

he could drop dead of a heart attack at any time. I will see you at 3 PM. I hope to have [my father's attorney] with me."

13

before William signed them. Debra, Michael, a notary, the notary's husband, and a healthcare worker were present. The notary believed William's attorney was extremely thorough in explaining the documents (a process which took hours), and did not see any signs that William was confused or subject to undue influence. Her husband, who was one of the subscribing witnesses, concurred. The healthcare worker was the other subscribing witness. She had spent 10 hours with William on that day altogether, and thought he was articulate and coherent throughout. She did not see any indication that William's execution of the documents was contrary to his wishes.

The notary's husband did not have any recollection of that afternoon in general (being more focused on reading his book) or of actually seeing William sign the will, but he would not have signed the attestation if it had not been accurate. The healthcare worker also did not recall seeing William sign the will specifically (although she did see him signing documents), but the notary had told her that he signed the will when the healthcare worker signed the attestation.

William's attorney had communicated with the siblings over the weekend about William's desire to protect EMCO from Roxanne by giving Michael alone a controlling interest in the company. After the execution of the documents on June 21 Debra became emotional about the transfer of EMCO control solely to Michael, and pressed her father on this issue. He told her of his desire to protect Michael and EMCO from Roxanne, and assured her that she would get a share of the profits. She protested that this was not expressly stated anywhere. As a result, William and his children drafted a document on the spot with the assistance of William's attorney, which they executed and notarized. It provided in general fashion that William "has expressed the intention to provide for [Debra and Douglas] to share in the profits of . . . EMCO. [¶] The parties agree that the mechanics will be set in place to realize William Doherty's intention. [¶] To this end, the necessary paper work will be drawn up as soon as possible . . . ."

14

On June 24, William—acting as a one-person EMCO board—appointed Michael to the other seat on the EMCO board, and to the corporate offices of president, chief financial officer, and secretary. The EMCO board also ratified the stock option that William had issued to Michael. (Again, the validity of these actions is not a concern of this appeal.) William then told his attorney to get the Boutin firm to develop a formal profit sharing agreement, and take measures to solidify Michael's control of EMCO. William next called his accountant (who had been handling the Dohertys' income taxes for 20 years) and asked her to meet with him the next day (June 25).

Debra and Douglas were present intermittently while the accountant spoke with William, who seemed fully coherent to the accountant. William told the accountant that he wanted Michael to continue running EMCO without any reduction in his salary, and that he had taken steps to convey a controlling share of the ownership interest to Michael. The accountant expressed her (lay) concern that William could not affect Roxanne's interest in the company adversely by unilaterally issuing shares to someone else. She did not recall William bringing up the subject of any dissatisfaction with his will or trust at any time. He did not ask her to take any actions in response to his concerns.

The siblings transferred large sums of money from joint bank accounts to accounts to which Roxanne did not have access. They undertook these transactions *with William's knowledge and consent* (except for $400,000 in cash removed from a safe in the home after Roxanne's arrest).[15]

---

[15] We ignore Roxanne's repeated appellate suggestions that Michael and his siblings were malefactors in taking these actions; to the extent these suggestions are even probative on the issues on appeal, they are again in derogation of this contrary evidence supporting the judgment.

15

After William's death on July 2, 2010, Michael had attempted to execute a profit sharing plan with his siblings. However, they now were seeking ownership interests and seats on EMCO's board of directors, and declined to enter into any agreement.

***Statement of Decision***

The trial court's tentative ruling summarizes the evidence at length in largely the same manner as we have set out above. As this is only a tentative decision, however, its contents are immaterial to this appeal and we disregard Roxanne's arguments to the extent they rely on it. (*Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 199.)

The statement of decision is a thing of amazing brevity, given the record. Even without expressly considering the evidence of enmity between the spouses, the court found that it was not unusual for William to leave his entire disposable estate to his children to the exclusion of Roxanne, where her share of the community was substantial. The court also found William had wished to preserve EMCO through transferring a majority interest to Michael and giving him sole management authority, because William did not believe it could be run with a family committee that included people who had never been actively involved with the company. Accordingly, neither Michael nor his siblings received any undue benefit under the will and trust, and Roxanne failed to carry her burden of establishing undue influence on Michael's part. William had testamentary capacity on June 21, a point even Roxanne's expert conceded, and the expert did not convince the court that William was suffering from HE.[16] Michael and Debra also satisfied their burden of establishing the due execution of the will.

---

[16] Therefore, Roxanne's constant characterizations of William as being both physically and mentally debilitated (and extensive citation of *contrary* evidence to this effect) are not well taken because they fly in the face of the substantial evidence that supports the judgment. We therefore disregard them.

# DISCUSSION

## I. There Was Proper Execution of the Will

Roxanne argues William did not comply with the requirement for due execution of a will in section 6110 that it "shall be witnessed by being signed . . . by at least two persons each of whom (A) . . . witnessed either the signing of the will[,] or the testator's acknowledgment of the signature or of the will[;] and (B) understand that the instrument they sign is the testator's will." (§ 6110, subd. (c)(1).) She notes neither the husband of the notary nor the healthcare worker could recall seeing William in the act of signing the will (and neither of whom attested to William making any declaration about signing a will). Roxanne asserts this testimony overcomes the presumption of due execution arising from the attestation clause in the will. (*Estate of Ben-Ali* (2013) 216 Cal.App.4th 1026,1036 (*Ben-Ali*).)

"The question of due execution of a will is one of fact, and the probate court's finding will not be reversed on appeal if there is any substantial evidence to sustain it." (*Ben-Ali*, *supra*, 216 Cal.App.4th at p. 1033.) The testimony of the husband is somewhat ambiguous as to whether he could not recall any of the circumstances, or could in fact recall that he did not actually see William sign the will; however, he acknowledged that he would not have signed the attestation clause if its contents were not true. The healthcare worker's testimony, however, is clear that she neither actually saw William sign the will nor heard him acknowledge signing a will.

Nevertheless, "[a] will not executed in compliance with section 6110, subdivision (c)(1) may . . . be admitted to probate if the proponent establishes by clear and convincing evidence [that] the testator intended the instrument to constitute his will at the time he signed it" under subdivision (c)(2) of the statute (hereafter section 6110(c)(2)). (*Ben-Ali*, *supra*, 216 Cal.App.4th at p. 1037 [though finding insufficient evidence to sustain such a finding].) This is a "broad and remedial" statute, the goal of which was

17

intended to "moderniz[e] probate procedure" to prevent procedural omissions from overriding a testator's intent where the process of executing the instrument is defective. (*Estate of Stoker* (2011) 193 Cal.App.4th 236, 242, 244.)

In our view, a reasonable trier of fact could have found this standard satisfied on the evidence we have recited at length above (and will not reiterate here) regarding William's conduct in his last weeks. Roxanne, after initially ignoring this issue in her opening brief, asserts in her reply brief that section 6110(c)(2) *cannot* apply where both subscribing witnesses have testified. She rests this assertion solely on section 8253, which permits testimony of other witnesses "to prove *the due execution of the will*" only where "*no* subscribing witness is available." (Italics added.) She does not provide any authority applying section 8253 to section 6110(c)(2), and we decline to limit the latter statute in this fashion because it does not involve proof of *due execution* but rather involves proof of the *testator's intent* where the prescribed proof of due execution is lacking. Her alternative argument—that we cannot find William intended the document to be his will because it did not include provisions for profit sharing—is subsumed within our rejection later in the Discussion (*post*, pp. 23-25) of her unpersuasive separate arguments to this effect. We therefore find this claim to be without merit.

## II. The Privilege Ruling Was Immaterial

During the questioning of the Boutin corporate attorney (who had provided legal services for EMCO for 15 years), Roxanne's lawyer attempted to ask about the substance of a five-minute phone call the Boutin attorney had with William on June 24, 2010—in particular, whether this involved William's corporate actions as the board of EMCO (that we described above taking place on that date) or the trust and will executed three days earlier. The trial court sustained Michael's invocation of the attorney-client privilege between the Boutin firm *and William's attorney*. The Boutin attorney did testify that the phone call had "summarized for [William] a recommendation that I had" regarding

18

"corporate matters"; the Boutin attorney had not discussed with William before this phone call either the subject of the latter having executed a will conveying the latter's interest in EMCO to Michael, or of effecting William's intent to share EMCO profits equally among the siblings.

Roxanne argues communications between *William* and the Boutin attorney are not privileged because William is a deceased client and the subject involves an issue among parties claiming through William, or his intentions regarding a testamentary instrument, or the validity of the same. (Evid. Code, §§ 957, 961, 962.) As for the prejudice flowing from this exclusion, her entire opening argument is that it "preclud[ed] evidence *further demonstrating* the foiling of [William's] intentions[,] and *bolstering* the presumption of undue influence" (italics added), relying on a case excusing an appellant for the failure to have made an offer of proof as a prerequisite to arguing prejudice on appeal in which a trial court had excluded an *entire class* of evidence. (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 91 [expert testimony on an issue requiring it].) In her reply brief, Roxanne contends she has "raise[d] the *inferences* (a) that disclosure of [the phone call's content] would have impeached the validity of the Will/Trust, and (b) that a different result therefore would have been 'probable.' " (Italics added.)

Our obligation to consider an argument arises only where an appellant has fulfilled the duty to establish prejudice. (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 614-615.) In considering prejudice, "[w]e will not reverse the judgment on the basis of speculation regarding" facts dehors the record. (*People v. Ayala* (2000) 24 Cal.4th 243, 267 [unknown factual issues defense counsel might have raised if the hearing with prosecution had not been ex parte are not a basis for reversal].)

We do not need to resolve the issue of attorney-client privilege in the context of the multiple roles in the present case in which the Boutin firm may have served EMCO, William as an individual, William's attorney, or Michael as an executor and trustee.

19

Roxanne's *speculations* (garbed as they are in the sheep's clothing of "inferences") that the answers the Boutin attorney *might* have given on the subject of the corporate matters he discussed in the phone call with William *might* have been a smoking gun on the issue of testamentary intent are plainly inadequate to establish the required prejudice. Having thus forfeited our plenary consideration of the argument, it is sufficient for us to note that there is otherwise an abundance of evidence of William's goals in estate planning that culminated in the instruments executed on June 21, and of his actual corporate actions on June 24. We thus do not believe it is reasonably probable that *any* testimony regarding the corporate matters discussed in the phone call, which Roxanne acknowledges would simply "further demonstrat[e]" and "bolster[]" her case, would have resulted in a more favorable outcome for Roxanne. As a result, we find this argument to lack merit.

### III. A Presumption of Undue Influence Did Not Arise

Ordinarily, a contestant bears the burden of proving with clear and convincing evidence that a testamentary instrument was the result of undue influence. However, *if* the contestant produces substantial evidence that the proponent of the testamentary disposition was in a *confidential relationship* with the decedent, *actively participated* in the actual preparation or execution of the testamentary instrument, and received an *undue benefit* from the instrument, the burden shifts and it is now the proponent who must prove by a preponderance of evidence that the instrument is *not* a product of undue influence. Whether the presumption arose and (if so) whether it was rebutted are questions for the trier of fact. (*Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035, 1059-1060; §§ 6104, 8252, subd. (a).) The trier of fact's determination of this issue "is upheld in nearly all cases." (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 130, p. 193.)

Roxanne asserts "[t]here is overwhelming direct and circumstantial evidence" of the three necessary elements giving rise to a presumption of undue influence, and thus

the trial court erred in failing to shift the burden to Michael to defeat the presumption. The presence of a confidential relationship between Michael and William is not reasonably subject to dispute and, while we disagree that the evidence summarized above established that Michael "was the driving force in the preparation and execution of the challenged Will/Trust," we will assume there is sufficient evidence to give rise to an inference that Michael played at least *some* role in their preparation by his facilitation of his father's wishes to have the Boutin firm involved in the drafting of the instruments and his presence at the meeting between the Boutin firm and William's attorney (*Estate of Swetmann* (2000) 85 Cal.App.4th 807, 821 [procuring attorney of itself insufficient; must be evidence beneficiary had some effect on contents of will]); we note that Michael does not argue to the contrary on appeal. We turn to the third element, which is the crux of Roxanne's contention (and indeed her appeal).

The determination of whether Michael received an undue benefit "clearly entails a *qualitative* assessment of the relationship between the decedent and the beneficiary" that necessarily empowers the trier of fact to determine "what profit *would* be 'due.' " (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 607, italics added.) This assessment cannot rest on the premise that an omitted heir has some entitlement overriding the freedom to devise property as one chooses, and thus a proponent's status as a "natural" object of bounty for the decedent is a relevant but not determinative factor because it would otherwise be a shield for those natural objects of bounty poised to exercise undue influence. (*Ibid*.; *Estate of White* (1954) 128 Cal.App.2d 659, 667 [status as alleged unnatural object of bounty immaterial]; *Estate of Abert* (1949) 91 Cal.App.2d 50, 58-59 [status as alleged natural object of bounty immaterial].) In her derivative-champion role, Roxanne asserts the bequest to Michael of William's entire interest in EMCO—and thus the *right* to William's entire share of EMCO profits—is contrary to the undisputed evidence that William expressly desired a split of EMCO profits equally among the siblings. She

21

contends this established Michael received more than his due under the instrument as a matter of law.**17**

This argument borders on the frivolous, attempting to recast all the evidence we summarized above as establishing that William's profit sharing object was the sine qua non of his estate planning. It is essentially undisputed that William's consistent and *foremost* goal was to ensure that EMCO continued as a successful business under the control of *Michael,* which required insulating it from Roxanne's control in particular or the problems of a family management committee in general (that could also result in Douglas ceding control to Roxanne). It is also essentially undisputed that William had profit sharing as *a* goal, but the unspecified complications of providing for this without also providing ownership interests to Debra and Douglas had led William to subordinate this aim in the estate planning process itself. It was only Debra's emotional harangue— *after* the will and trust's execution—that induced William to take more immediate action *independent of* the testamentary instruments themselves to achieve it; there is an absence of any evidence that William wanted to change the *testamentary instruments* themselves. He in fact continued to attempt to convey a majority share of EMCO through corporate action to Michael at the same time as the execution of the instruments. Presumably, William had enough trust in Michael to provide for his siblings even absent their ability to *compel* Michael to do so (which indeed Michael attempted unsuccessfully to do after William's death, his siblings instead insisting on a grant of ownership interests that their father expressly did not want to give them): On three separate occasions in June 2010, William executed instruments giving Michael his entire ownership interest in EMCO. This evidence gives utter lie to a claim that Michael received an undue benefit. We

---

**17** Roxanne does not appear to challenge the trial court's finding that *collectively* the siblings did not receive an undue benefit (in the form of the entirety of their father's property interests) where she had a substantial community interest herself.

therefore find without merit Roxanne's argument that the trial court erred in failing to shift the burden to Michael to refute his undue influence in the instruments' execution.

## IV. The Instruments Do Not Lack Testamentary Intent

Couching her same claim in the form of an alternative basis for invalidating a testamentary instrument under section 8252, Roxanne makes a confusing argument that the *provision* (contained in what William indisputably intended to be a testamentary instrument) conveying William's entire interest in EMCO (and the right to half of the profits) did not reflect his actual testamentary intent because it did not result in a division of EMCO profits among the siblings. Therefore, "the Will/Trust *provisions* as to EMCO are invalid" (italics added). However, she also argues elsewhere that the instruments as a whole are invalid on this basis.

The authority she cites does not illuminate her argument. *Estate of Wong* (1995) 40 Cal.App.4th 1198 involves the issue of whether a holographic writing was intended to *be* a will (on which issue its conformity with the decedent's testamentary intentions are immaterial). The court stated, "Section 8252 is meant to apply to documents that are clearly wills. Thus, [a contestant] challenging a document that apparently is a will and does exhibit testamentary intent, must prove testamentary intent was lacking due, for example, to undue influence. Where the question is *whether* a document exhibits testamentary intent, clearly this [statute] does not apply." (*Id*. at p. 1205.) This is not the present circumstance. *Estate of Llewellyn* (1948) 83 Cal.App.2d 534, 563 involves a discussion of insufficient evidence of undue influence, not an issue in *this* context. *Estate of Smith* (1998) 61 Cal.App.4th 259 (*Smith*) takes pains to clarify that "[i]n a will contest, the issues are limited to those concerning whether the *document* at issue is or is not the testator's duly executed, valid will." (*Id*. at p. 265, italics added.) As a result, extrinsic evidence of mistake as to the *effect* of the testamentary instrument in the disposition of property is not a basis for invalidating the *instrument* as lacking testamentary intent. (*Id*.

at pp. 262, 266 [extrinsic evidence cannot be admitted " 'for the purpose of proving the meaning the testator attributed to specific provisions,' " quoting *Estate of Sargavak* (1950) 35 Cal.2d 93, 96-97 (will thought to be mortgage)].) " 'Testamentary intent' in this context does not refer to the testator's intentions regarding particular dispositions of property. It means the testator's general intent to make a revocable disposition of . . . property . . . ." (*Smith*, *supra*, 61 Cal.App.4th at p. 270.) We are thus left adrift in our attempts to discern how "testamentary intent" untethered to undue influence, fraud, duress, mistake, or revocation (section 8252) has any meaning in invalidating an instrument *otherwise intended* to be testamentary in nature.

However, our puzzlement does not need to be assuaged. Roxanne in any event does not provide any authority for invalidating an instrument based on a provision that does not reflect extrinsic evidence of a purportedly contrary intent. Though she cites authority to the effect that courts must preserve the intention of the testator, all rules of construction of instruments yield to a paramount principle: It is the intention of the testator *as expressed in the testamentary instrument* that is controlling. (*Smith*, *supra*, 61 Cal.App.4th at p. 271.) Her arguments in her reply brief on the need for provisions in an instrument to reflect the testator's intent *accurately* are unsupported and run afoul of the express holding of *Smith*, where clearly the testator was mistaken about the *result* but this was not a sufficient basis to invalidate the will; a "testamentary intent" contrary to the *expressed* testamentary intent cannot be treated any differently. Consequently, evidence of William's goal of profit sharing cannot invalidate an instrument conveying his interest in EMCO to Michael.[18] Nor, for that matter, does a "contrary" intent even

---

[18] She also argues the instruments as drafted could not *effectively* convey William's interest in EMCO under corporate law. That would be the subject of a malpractice action on the part of the beneficiary, but does not shed any light on the subject of testamentary intent.

appear. As we have explained in rejecting her theory of undue benefit to Michael, there is an absence of evidence that *William* thought the conveyance of his EMCO interest would necessarily impede a profit sharing goal that could be achieved through other means (that he ultimately did not have time to complete). We thus again find Roxanne's argument to lack merit.

## DISPOSITION

Roxanne's motion for judicial notice is denied. The judgments are affirmed, and Michael shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


              BUTZ            , J.


We concur:


     RAYE          , P. J.


     MAURO       , J.